IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RKN CONCRETE CONSTRUCTION,
INC., *et al.*,

                Plaintiffs,

              v.

LABORERS' PENSION FUND,
*et al.*,

                Defendants.

Case No. 13 C 9153

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

This ERISA case arises from a dispute over interim withdrawal liability payments that contractors RKN Concrete Construction, Inc. ("RKN"), Ryan Specialized Service, Inc. ("RSS"), and Fogarty Land Development, LLC ("FLD") (collectively, the "Plaintiffs") allegedly owe Defendants Laborers' Pension Fund, Laborers' Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, and Funds Administrator James Jorgensen (collectively, the "Funds"). Plaintiffs initiated the instant lawsuit in late 2013 seeking declaratory relief, prompting the Funds to counterclaim for payment. On February 3, 2015, both parties moved for summary judgment [ECF Nos. 38 and 42].

Although the root of the Funds' claim is a Collective Bargaining Agreement entered into with RKN, the Funds also seek payment from RSS and FLD under various theories imposing joint and several liability. Thus, there are two issues at stake: (1) RKN's underlying interim withdrawal liability, and (2) RSS's and FLD's joint and several liability in connection with RKN.

The Court notes at the outset that, subject to a narrow exception for frivolous claims, defenses to an assessment of withdrawal liability are subject to mandatory arbitration under Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"). Because Plaintiffs have not shown that the frivolous claims exception applies to this case, RKN is liable to the Funds for interim withdrawal liability payments. However, the Court finds that RSS is not liable under the successor, single employer, or alter ego theories the Funds assert. Accordingly, the Motions for Summary Judgment are granted in part and denied in part.

## I. BACKGROUND

The Court has derived the following information from the Parties' Local Rule 56.1 Statements. The Court notes disputed facts where necessary.

### A. RKN and RSS

Philip Fogarty ("Phil") established RKN in the mid-1990's to perform residential and commercial concrete and excavation work. Up until the company's dissolution in May 2014, Phil

- 2 -

served as the President and sole shareholder of RKN. His wife, Nancy Fogarty, served as Secretary-Treasurer and was RKN's only other corporate officer.

RKN performed union work exclusively, and was a signatory to a series of successive Collective Bargaining Agreements with the Laborers' District Council of Chicago and Vicinity (collectively, the "Agreement"). The Agreement required RKN to make contributions to the Funds for pension, health, and welfare benefits on behalf of all covered RKN employees.

In November 2010, RKN's business took a hit when its biggest account, Pulte Homes, demanded a 20% price reduction on residential concrete jobs, and informed RKN that it would begin to entertain bids from non-union contractors. Upon hearing the news, Phil concluded that RKN would not be able to perform residential concrete work with union laborers at the low rate Pulte demanded. As a result of Pulte's announcement, RKN laid off several employees, including Phil's daughter, Ryan Fogarty ("Ryan"), who performed clerical work at RKN, and two RKN foremen, Kyle Fogarty ("Kyle") and Ken Kramerich ("Ken"). RKN continued to perform commercial concrete and excavating work after Pulte's announcement, although the parties dispute how much work took place. Ultimately, RKN closed its doors in May 2013. The Agreement was terminated on May 31, 2013. By early 2014, RKN had dissolved completely.

In 2008, while she was still employed at RKN, Ryan formed RSS to perform snowplowing work. Ryan rented snowplowing equipment from RKN, and hired Ken to perform some of the plowing in the evenings. At all times, Ryan has served as President and majority shareholder of RSS.

In late 2010, around the time of her layoff, Ryan learned of Pulte's decision to accept bids from non-union contractors. Ryan contacted one of Pulte's purchasing agents regarding the possibility of putting in a bid on behalf of RSS. Ryan then held a meeting at RKN, announcing to RKN workers that RSS would begin bidding on residential concrete jobs. At the same meeting, Phil announced to the workers that RKN would be pulling out of the residential concrete market. In December 2010, RSS placed its first bid on a Pulte contract — even though it owned no concrete equipment, had no employees, and had never performed any residential concrete work before.

In March of 2011, RSS purchased residential concrete equipment and supplies from RKN for a purchase price of $1 million. Ryan personally guaranteed payment through a promissory note, although she lacked the assets to cover a default. The sale price of the equipment was based on a bank appraisal, while the supplies were negotiated separately. Ryan initially agreed to make monthly payments of $19,332.80 for the next ten years, but this amount was later reduced to $8,000.00

per month.   To date, Ryan has paid approximately $675,475. According to Plaintiffs, neither RKN nor RSS knew of any actual or potential withdrawal liability at the time of the sale.   The Funds state that both Phil and Ryan knew of RKN's obligations under the Agreement.

That same month, RSS was awarded the Pulte contract and began performing residential concrete work on a non-union basis. Kyle and Ken purchased 5% shares of RSS stock, and became corporate officers of RSS.   Ken and Kyle also serve as field managers at RSS, which requires them to hire, fire, and discipline employees.   Kyle and Ken currently supervise approximately 25–30 employees, including several foremen.   RSS performs non-union work exclusively, and has never been a signatory to any collective bargaining agreements.

By July 2013, RSS had expanded into excavation work and was performing excavation jobs for Pulte alongside RKN in some of the same developments.   That month, RSS acquired a dump truck and trailer from RKN.   No payments were made on the equipment until September 2014, when the lease agreement for the truck and trailer was reduced to writing.

RKN and RSS have never shared any common officers, directors, or shareholders.   The companies are separately incorporated and have separate offices, books, bank accounts,

federal IDs, and licenses. The parties dispute whether the two entities held separate insurance policies in 2010.

At least one RKN employee — Kara Coyle — simultaneously performed work for RKN and RSS from approximately 2011 to 2013 or 2014, although the Funds contend that three other employees worked for both companies at the same time. Plaintiffs state that, from March 2011 to the end of 2014, RSS has had 139 different employees, and that only 30 of those employees formerly worked for RKN. The Funds argue that 37 of RSS's current employees once worked for RKN, and that in April 2011, 35 of RSS's original 40 employees were RKN transplants. Five of RSS's 24 current accounts are former RKN accounts.

## B. FLD

Phil formed FLD in 2003 as a limited liability company, in which he is the only member. FLD holds a single piece of farmland, which it rents for approximately $5,000 per year. Phil spends less than an hour a year on FLD matters, such as depositing rent checks. However, FLD also retains an accountant and attorney who handle FLD matters. FLD has no phone number and no employees, although it has its own Federal Employer Identification Number ("FEIN"). Phil reports FLD's rent on his personal tax return.

## C. The Funds' Withdrawal Liability Assessment

On June 28, 2013, RKN received notice from the Funds that it owed $352,247.46 in withdrawal liability. The Funds demanded that RKN pay the withdrawal liability through three quarterly payments of $106,036 plus a final quarterly payment of $42,249.00. RKN requested review of the assessment, and the initial due date of July 25, 2013 was postponed. On November 15, 2013, the Funds reinstated their demand for withdrawal liability and put in place a revised payment schedule, with the first payment due on December 26, 2013. Plaintiffs remitted their first and only payment of $106,036.00 on February 23, 2014. RKN has never initiated arbitration proceedings. Plaintiffs contend they are not subject to the MPPAA's mandatory arbitration requirement, 29 U.S.C. 1401(a) — a claim that the Funds dispute.

On December 23, 2013, Plaintiffs filed a three-count Complaint seeking declaratory and injunctive relief. (Compl., ECF No. 1.) Specifically, Plaintiffs requested (1) a declaration that RSS is not an employer under the MPPAA or an alter ego of RKN, and that RKN and FLD are not alter egos of one another or part of the same control group; (2) a declaration that no Plaintiff is an alter ego of another, that the Funds are not entitled to Plaintiffs' records, and that Plaintiffs did not commit a fraud upon the Funds; and (3) an order enjoining the

Funds from either requiring interim payments or declaring a default pending this litigation. (*Id.*)

A month later, Defendants counterclaimed, seeking (1) RKN's payment of quarterly withdrawal liability installments, (2) a declaration that FLD is part of the RKN control group and is jointly and severally liable for the installments RKN owes to the Funds, and (3) a declaration that RSS is an alter ego of, single employer with, or successor of RKN, and is jointly and severally liable for the installments that RKN owes to the Funds. (Defs.' Answer, ECF No. 7.) In September 2014, the Funds issued a Revised Audit of RKN's and RSS's books, revealing additional delinquencies.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those that affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party may meet its burden by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If the moving party satisfies its initial burden, the non-moving party

must demonstrate with evidence "that a triable issue of fact remains on issues for which [it] bears the burden of proof." *Knight v. Wiseman,* 590 F.3d 458, 463-64 (7th Cir. 2009).

The judge's role at summary judgment is not to make credibility determinations or weigh the evidence. *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007). In determining whether a genuine issue of material fact exists, the Court construes all evidence in the light most favorable to the nonmoving party. *Bellaver v. Quanex Corp.,* 200 F.3d 485, 491-92 (7th Cir. 2000). Where both sides have moved for summary judgment, "the court evaluates each . . . motion on its own merits . . . draw[ing] all reasonable inferences against the party whose motion is under consideration." *Berrum v. Freyberger,* No. 01 C 802, 2004 WL 557394, at *2 (N.D. Ill. Mar. 19, 2004).

### III. ANALYSIS

Before the Court can reach the issue of RSS's and FLD's liability, Court must first determine whether the Funds' claim for withdrawal liability against RKN has merit.

### A. The Funds' Claim for Withdrawal Liability Against RKN

The Funds argue that because RKN has not remitted all of its interim withdrawal liability payments, as required under ERISA, it is entitled to summary judgment on the issue of RKN's underlying liability to the Funds. RKN contends that it is

excused from the interim withdrawal liability payments under ERISA's Building and Construction Industry Exception ("BCIE").

The MPPAA imposes withdrawal liability on employers that withdraw from multiemployer pensions plans. 29 U.S.C. §§ 1381, 1391. Normally, a complete withdrawal from a multiemployer pension plan occurs when an employer "permanently ceases to have an obligation to contribute to the plan" or "permanently ceases all covered operations under the plan." *Id.* § 1383(a). Withdrawal liability ensures that "the financial burden of [the] employees' vested pension benefits will not be shifted to the other employers in the plan." *Cent. States, Se. & Sw. Areas Pension Fund v. Bell Transit Co.,* 22 F.3d 706, 707 (7th Cir. 1994) (citation and internal quotations omitted). After determining the amount of withdrawal liability owed, a pension fund will send a withdrawing employer notice and a demand for payment. 29 U.S.C. § 1399(b). Although an employer may seek review of a pension fund's assessment of withdrawal liability, and ultimately initiate arbitration proceedings to resolve the dispute, "payment must begin immediately and is not suspended during challenge." *Cent. States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.,* 620 F.3d 766, 772 (7th Cir. 2010); *see,* 29 U.S.C. §§ 1399(c)(2), 1401(d).

In general, district courts lack jurisdiction over disputed claims for withdrawal liability, which are subject to mandatory

arbitration.  *Cent. States, Se. & Sw. Areas Pension Fund v. St. Louis Post-Dispatch, LLC,* No. 07 C 1384, 2007 WL 2492084, at *2 (N.D. Ill. Aug. 28, 2007).  To challenge an assessment of withdrawal liability, or assert a defense to it, an employer must initiate arbitration within 60 days of a pension fund's response to its request for review, or within 120 days of its initial request for review, whichever is earlier.  *See,* 29 U.S.C. § 1401(a).  However, if an employer seeks declaratory relief contesting liability, the time period for initiating arbitration may be tolled.  *See, Trustees of Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp., Inc.,* 888 F.2d 1161, 1164 (7th Cir. 1989).

Whether or not an employer pursues arbitration, funds may sue to collect unpaid withdrawal liability.  If an employer fails to make payments while arbitration is pending, the plan may file suit to collect on the "interim" withdrawal liability payments, but not the entire amount owing.  *Trustees of the Suburban Teamsters of N. Ill. Pension Fund v. Nagel Trucking & Materials, Inc.,* No. 11 C 2775, 2011 WL 6792767, at *3 (N.D. Ill. Dec. 22, 2011).  If an employer fails to make payments — and fails to initiate arbitration — the plan may sue for the entire amount on an accelerated basis.  *Id.*  Although Plaintiffs failed to initiate arbitration within the statutory timeframe, they filed an action for declaratory relief before the statutory

timeframe expired. For this reason, the timeframe for initiating arbitration is tolled, and the Funds seek only past-due interim withdrawal liability pending arbitration. (*See,* Funds' Mem., ECF No. 43, at 10.)

To prevail on a claim for collection of unpaid interim withdrawal liability, a pension fund must show that (1) it is a multiemployer pension plan and the defendant is an employer under ERISA, and (2) the pension fund notified the defendant of liability. *See, Chicago Truck Drivers v. El Paso Co.,* 525 F.3d 591, 597–98 (7th Cir. 2008) (citation and internal quotations omitted). An "employer" under the MPPAA is an entity with a contractual obligation to contribute to a pension plan. *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.,* 85 F.3d 1282, 1287 (7th Cir. 1996).

The Court finds that the Funds have established the requisite elements for interim withdrawal liability. The parties agree that the Funds are multiemployer pension plans, and they do not dispute that RKN was obligated to make contributions to the Funds pursuant to the Agreement. In addition, the parties do not dispute that the Funds notified RKN of withdrawal liability in its June 28, 2013 demand letter, and then again in its November 15, 2015 reinstatement letter, both of which RKN received.

As the Seventh Circuit has noted, there are few exceptions to a pension plan's right to interim payments, which protect funds from insolvency while disputes are resolved. *Cent. States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.,* 272 F.3d 1000, 1002-03 (7th Cir. 2001). Interim payments may be excused pending arbitration if an employer shows that (1) the pension plan's claim is frivolous, lacking any arguable basis in law or fact, and (2) that the employer would suffer irreparable harm if forced to make interim payments. *Cent. States, Se. & Sw. Areas Pension Fund v. Murphy Bros., Inc.,* 772 F.Supp.2d 918, 921 (N.D. Ill. 2011) (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Bomar Nat., Inc.,* 253 F.3d 1011, 1016 (7th Cir. 2001)). If the district court determines that a plan's claim is non-frivolous, "the court should order the making of interim payments and leave the rest to the arbitrator." *Trustees of Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transport, Inc.,* 935 F.2d 114, 119 (7th Cir. 1991).

Rather than arguing this equitable exception directly, Plaintiffs assert a defense to withdrawal liability under the BCIE. For employers in the building and construction industry, complete withdrawal only occurs when (1) the employer's obligation to contribute to the pension plan ceases, and (2) the employer continues to perform work in the jurisdiction of the

underlying collective bargaining agreement. *Id.* § 1383(b)(2). Although RKN's obligation to contribute to the Funds ceased on May 31, 2013, Plaintiffs argue that "complete withdrawal" never occurred because RKN did not continue to perform concrete or excavating work in the jurisdiction of the Agreement after that date. Plaintiffs do not touch the issue of irreparable harm. (Pls.' Mem., ECF No. 47, at 3 ("[I]f the Funds brought an appropriate motion, RKN would have pled financial hardship.").)

The Court is not persuaded that Plaintiffs' bare assertion of the BCIE excuses interim withdrawal liability payments. Even if the Court accepts that the BCIE would render the Funds' claim non-colorable (which Plaintiffs do not argue in support of their motion), Plaintiffs have not proven that the BCIE is applicable in this case — instead, they assert the BCIE presuming that it applies. Moreover, Plaintiffs do not argue that they will suffer any economic hardship if compelled to make interim withdrawal liability payments. Plaintiffs' failure to argue irreparable harm precludes the Court from accepting their defense to interim withdrawal liability. *Cent. States, Se. & Sw. Areas Pension Fund v. Manning Motor Express, Inc.,* 125 F.Supp.2d 1113, 1115 (N.D. Ill. 2000) ("An employer must satisfy both elements, frivolity *and* irreparable harm.").

Because Plaintiffs have failed to show that they are excused from interim liability payments under the Seventh

- 14 -

Circuit's narrow exception for frivolous claims, the issue of whether the BCIE applies must be arbitrated. *See,* 29 U.S.C. § 1401(a)(1) (requiring arbitration of all disputes "under sections 1381 to 1399"). The Court addresses the merits of the Funds' theories of joint and several liability below, and "leaves to the arbitrator the ultimate questions of the applicability of the BCIE and the final status of [Plaintiffs'] withdrawal liability to the Fund[s]." *Murphy Bros.,* 772 F.Supp.2d at 922. Summary judgment is therefore granted to the Funds on the issue of RKN's interim withdrawal liability.

## B. The Funds' Claim for Withdrawal Liability Against RSS

Having established the threshold issue of RKN's liability, the Court now assesses whether RSS is jointly liable for unpaid withdrawal liability as well as other unpaid contributions revealed in the Revised Audit. The Funds assert three theories in support of joint liability: (1) successor liability, (2) single employer liability, and (3) alter ego liability.

### 1. *Successor Liability*

The successor liability doctrine imposes withdrawal liability on the purchaser of substantially all of a business's assets if (1) the successor had notice of a claim against the business prior to the acquisition of assets, and (2) there is substantial continuity in the operation of the business before and after the sale. *Chicago Truck Drivers, Helpers & Warehouse*

*Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.,* 59 F.3d 48, 49 (7th Cir. 1995).  The Funds urge that the first element is met in this case because of the undisputed fact that Ryan knew of RKN's obligations under the Agreement when she purchased equipment and supplies from RKN in 2011.  Plaintiffs argue that successor liability requires notice of an actual claim – not merely notice of the Agreement and the potential liability that might arise under it.  Because the Funds' claim for withdrawal liability payments did not arise until 2013, Plaintiffs argue, RSS lacked notice of the Funds' claim when it acquired RKN's assets in 2011.

Courts within the Seventh Circuit have most frequently found successor liability to arise when a purchaser is on notice of an existing claim against the seller, or at least aware of delinquent payment obligations, at the time assets are acquired. *See, e.g., Haltom v. Tiernan & Hoover, Inc.,* 976 F.Supp.2d 1007, 1017 (S.D. Ind. 2013) (expressing "serious doubt" that successor had notice of claim where successor acquired assets several months prior to pension plan's demand for withdrawal liability); *Chicago Dist. Council of Carpenters Pension Fund v. A.F. McCarthy, Inc.,* No. 94 C 6881, 1996 WL 563459, at *7 (N.D. Ill. Sept. 30, 1996) (stating that "[i]t would require an extreme circumvention of logic" to find a successor had notice of a liability that was not established at the time the successor

company was formed); *see also, Sullivan v. J.S. Sales Plumbing, Inc.,* No. 92 C 7393, 1994 WL 55658, at *6 (N.D. Ill. Feb. 23, 1994) (finding successor had notice of claim when she opened her own plumbing business shortly after her husband was hit with a judgment of $80,000 in delinquent pension fund contributions). Where a purchaser lacks knowledge of a specific claim, "courts should refrain from subjecting the doctrine of successor liability to judicial surgery through a due diligence requirement." *Trustees of Chicago Plastering Inst. Pension Trust v. Elite Plastering Co.,* 603 F.Supp.2d 1143, 1151 (N.D. Ill. 2009) (citation and internal quotations omitted).

Although Ryan knew that RKN was a signatory to the Agreement when she purchased assets from RKN in 2011, there is no evidence that she knew of any delinquency at that time. No actual claim arose until June 28, 2013 — more than two years after RSS purchased equipment and supplies from RKN. Because the Funds' have failed to show Ryan's knowledge of an actual claim against RKN at the time of the purchase, or of any delinquency, the Funds' successor liability theory must be rejected. Plaintiffs are granted summary judgment on this issue.

### 2. Single Employer Liability

Under the single employer doctrine, "when two entities are sufficiently integrated, they will be treated as a single entity

for certain purposes." *Moriarty v. Svec,* 164 F.3d 323, 332 (7th Cir. 1998). When two or more entities qualify as a single employer, each is jointly and severally liable for the other's withdrawal liability, even if a particular entity was not a signatory to a collective bargaining agreement. *See, id.* To determine whether separate business entities qualify as a single employer, courts examine four factors: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wisc. & Its Local 5,* 724 F.3d 939, 946–47 (7th Cir. 2013) (citation and internal quotations omitted). The factors are viewed in light of the totality of the circumstances, and no single factor is dispositive. *Id.* "Ultimately, single employer status . . . is characterized by the absence of an arm's length relationship found among unintegrated companies." *Id.* (citation and internal quotations omitted). The parties do not dispute that RKN and RSS lack common ownership — while Phil served as the sole shareholder of RKN, Ryan is the majority shareholder of RSS, with Ken and Kyle holding 5% each.

The Funds argue that the three remaining factors weigh in favor of single employer liability. First, the Funds argue that RKN and RSS's operations are interrelated because RSS purchased most of its residential concrete and excavating equipment from

RKN, and then used that equipment to perform work for Pulte Homes. According to the Funds, as soon as RKN withdrew from performing residential concrete work, Phil "set the stage" for his daughter Ryan to bid on the same residential concrete jobs. (Defs' Mem., ECF No. 43, at 15.) Plaintiffs counter that RKN and RSS never shared common officers, directors, or shareholders, and that they maintain separate books, bank accounts, licenses, equipment, and offices. Even if RKN did "set the stage" for RSS's debut in the residential concrete industry, this does not demonstrate that RKN and RSS's operations were so interrelated that the two entities were indistinguishable. *See, Burnett v. Intercon Sec. Ltd.,* No. 97 C 3385, 1998 WL 142395, at *7 (N.D. Ill. Mar. 24, 1998). The Court finds that the first factor weighs against single employer liability.

Second, the Funds argue that the day-to-day management at RKN and RSS under Ken and Kyle are "nearly identical." (Defs' Mem., ECF No. 43, at 14.) The Funds argue that as RKN foremen, Kyle and Ken directed work in the field, reported employee hours, approved the quality of work performed, addressed paycheck discrepancies, and occasionally called off work in case of inclement weather. Plaintiffs do not dispute these facts, but explain that Kyle and Ken spent the bulk of their days working with the tools of the trade as "foremen in the field."

Plaintiffs note that Kyle and Ken never fired, hired, or disciplined employees while at RKN — duties that fell exclusively within Phil's domain. Plaintiffs also argue Kyle and Ken's duties at RSS differ substantially. For instance, Kyle and Ken now hire, fire, and discipline employees on a regular basis. They have also taken on new roles in decision-making and management, such as selecting which projects to bid on and which equipment to purchase.

Although there is some overlap between the roles Kyle and Ken played at RKN and the roles they play now — for example, they continue to submit employee time records and assure the quality of the work performed — this limited overlap is "not sufficient to destroy the separateness of management." *Trustees of Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co.,* 995 F.2d 785, 788 (7th Cir. 1999). The undisputed facts reveal two distinct management structures. At RKN, major decisions fell to Phil, while at RSS, those decisions now rest in Kyle and Ken's hands. The Court concludes that this factor also weighs against a finding of single employer liability.

Finally, the Funds argue that RKN and RSS share centralized control over labor relations because many employees that worked for RKN also worked for RSS. The only evidence the Funds put forth in support of this factor is that most of RSS's original

employees came from RKN. However, common evidence of centralized control of labor relations — such as unified control of hiring, firing, promoting, and paying employees — is absent here. *See, Lusk v. Foxmeyer Health Corp.,* 129 F.3d 773, 780 (5th Cir. 1997); *Smith v. Jones Warehouse, Inc.,* 590 F.Supp. 1206, 1208 (N.D. Ill. 1984) (finding centralized control of labor relations where employees at subsidiary were subject to parent company's personnel guidelines and received paychecks and W-2s from parent company). The Funds do not show that RSS's original employees were subject to the same employment policies or practices at both RKN and RSS, nor do they suggest that Phil continued to exercise control over RKN employees after they transitioned to RSS. The Court cannot conclude that the facts presented demonstrate centralized labor relations.

Accordingly the Court grants Plaintiffs summary judgment on the issue of RSS's liability as a single employer with RKN.

### 3. *Alter Ego Liability*

The alter ego doctrine is similar to the single employer doctrine. "Alter egos generally are found where two enterprises share substantially identical management, business purpose, operation, equipment, customers, and supervision as well as ownership." *Bd. of Trustees of Chicago Plastering Inst. Pension Trust Fund v. William A. Duguid Co.,* 761 F.Supp. 1345, 1348 (N.D. Ill. 1991) (citation and internal quotations omitted).

Although alter egos are often found where two entities qualify as a single employer, rejection of the single employer doctrine does not preclude application of the alter ego doctrine. *Favia,* 995 F.2d at 789; *Johnstown Corp.,* 322 N.L.R.B. 818 (1997). What is essential to an alter ego determination is that the second entity was created "to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets. In sum, unlawful motive or intent are critical . . .." *Favia,* 995 F.2d at 789 (citation and internal quotations omitted). The alter ego doctrine is applicable in cases where union companies dissolve and reemerge as a non-union company, as well as cases in which an entity "exists side-by-side with its alleged alter ego." *Chicago Dist. Council of Carpenters Pension Fund v. Vacala Masonry, Inc.,* 946 F.Supp. 612, 618 (N.D. Ill. 1996) (citation and internal quotations omitted).

The Court first turns its attention to the issue of intent. The Funds argue that RKN sold equipment to RSS through "sham transfers" motivated by Phil's desire to avoid his obligations under the Agreement. The Funds argue that the first "sham transfer" was the March 2011 sale of RKN's residential concrete assets to RSS. The second was the July 2013 transfer of RKN's dump truck and trailer to RSS, which RSS did not pay for until September 2014. The Funds contend that these transactions demonstrate Phil's intent to avoid his obligations under the

Agreement, while enabling his daughter to perform concrete and excavation work at a low price.

Intent may be established through direct or circumstantial evidence. *See, Chicago Dist. Council of Carpenters Pension Fund v. A.F. McCarthy, Inc.,* No. 94 C 6881, 1996 WL 563459, at *5 (N.D. Ill. Sept. 30, 1996). In *Centor,* the court found intent present where a soil contractor sent a letter to customers that it would be operating under a different name "[b]ecause of union labor problems," but business would continue as usual. *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Centor Contractors, Inc.,* 831 F.2d 1309, 1313 (7th Cir. 1987). The court concluded that the letter was "particularly damning, [as it] basically stated that the defendants were dissolving Centor to avoid their obligations to the Union." *Id.*

In *Sloan,* the circumstances of a transfer, coupled with attempts to cancel a collective bargaining agreement, demonstrated intent. *See, Cent. States, Se. & Sw. Areas Pension Fund v. Sloan,* 902 F.2d 593 (7th Cir. 1990). David Sloan transferred his excavating company's hauling operations to his wife Darlene, who set up a non-union shop to perform hauling work using the same employees and equipment. *Id.* at 597. No money changed hands in the transaction. *Id.* Sloan argued that his motivation for the transfer was to save his business, because his hauling operation could no longer be competitive in

the residential market. *Id.* at 595 n.3 (7th Cir. 1990). However, the court found Sloan's real motivation to be avoidance of a collective bargaining agreement. Prior to the transfer, Sloan had stated that he would have to cancel the agreement to stay in business, and had previously contacted the Teamsters in an attempt to do so. *Id.* at 595.

Here, the Funds fail to establish that Phil sold assets to RSS to avoid his obligations under the Agreement. First, there is no evidence that Phil had any desire to terminate the Agreement, or had attempted to do so, when he transferred assets to RSS in 2011. Plaintiffs point out that after RKN pulled out of the residential concrete market, it continued to perform commercial concrete and excavating work and pay into the Funds. In addition, Pulte's request for a 20% price reduction reveals an alternative motivation for selling assets to RSS, separate from the burden of pension plan contributions. Although certain facts suggest that the 2011 sale was not particularly sophisticated (for example, RKN did not shop around for other buyers or bother to investigate RSS's financial viability), the transaction was not bogus. The $1 million selling price was based, in part, on a bank appraisal, and to date, Ryan has made payments of $675,470. The Court finds this evidence sufficient to establish Phil's lack of unlawful intent in selling equipment to RSS. The Court need not consider the 2013 transfer of the

truck and trailer, which took place months after RKN's obligations under the Agreement ended.

For these reasons, the Court grants summary judgment to Plaintiffs on the issue of RSS's alter ego liability.

## C. The Funds' Claim for Withdrawal Liability Against FLD

Under 29 U.S.C. § 1301(b)(1), all trades and businesses that are under common control are treated as a single entity for the purposes of assessing and collecting withdrawal liability. To determine whether an entity is a trade or business, as opposed to an investment activity, courts within the Seventh Circuit apply the *Groetzinger* test. Under *Groetzinger,* courts consider whether a business owner engages in an activity "(1) for the primary purpose of income or profit; and (2) with continuity and regularity." *Cent. States, Se. & Sw. Areas Pension Fund v. CLP Venture LLC,* 760 F.3d 745, 749 (7th Cir. 2014) (citing *Comm'r of Internal Revenue v. Groetzinger,* 480 U.S. 23, 35 (1987)), *cert. denied,* 135 S.Ct. 964 (2015). Specifically, courts examine factors including the entity's "purpose, tax status, and legal form." *Id.*

Trades or business may be subject to common control under several arrangements, including a "parent-subsidiary group, a brother-sister group, or a 'combined' group consisting of both parent-subsidiary and brother-sister relationships" as defined by the tax code. *Cent. States, Se. & Sw. Areas Pension Fund v.*

*SCOFBP, LLC,* 668 F.3d 873, 880 (7th Cir. 2011) (citing 26 C.F.R. § 1.414(c)-2(a)).  In a brother-sister group, the arrangement the Funds assert, (1) five or fewer persons own a "controlling interest" (at least an 80 percent ownership) in two or more organizations, and (2) the same persons maintain "effective control" (at least 50 percent ownership) over each organization. 26 C.F.R. § 1.414(c)-2(b)(2), (c).  Here, there is no question that the ownership requirements of a brother-sister group are met.  Phil owned 100% of RKN and continues to own 100% of FLD.

Although it is clear that FLD is run "for the primary purpose of income or profit," the parties dispute whether FLD is a personal investment shielded from withdrawal liability or a formal, for-profit "trade or business."  The Funds note that the FLD is set up as an LLC, earns rental income, and has its own attorney and accountant, as well as a FEIN.  Plaintiffs counter that Phil spends less than an hour a year running the business, and reports FLD's rental income on his personal tax return.

Generally, formally recognized business organizations, such as LLCs, constitute trades or businesses under *Groetzinger*.  *CLP Venture,* 760 F.3d at 749; *see also, Cent. States, Se. & Sw. Areas Pension Fund v. One Stop, Inc.,* No. 03 C 4414, 2007 WL 7705585, at *15 (N.D. Ill. July 18, 2007) ("All of the MPPAA cases where a lessor was found not to be engaged in a trade or business involved an individual[,] none involved a

corporation."). For instance, in *SCOFBP,* the Seventh Circuit held that MCRI, an LLC holding several parcels of land, constituted a trade or business because it "earned rental income, paid business management fees, . . . applied for and was issued a [FEIN,] and contracted with professionals to provide legal, management, and accounting services on a contract basis." *SCOFBP,* 668 F.3d at 879.

The Court finds FLD's situation analogous to that of MCRI because it is an LLC that (1) generates rental income, (2) contracts with a lawyer and accountant who provide professional services, and (3) holds its own FEIN. Although the IRS disregards the separateness of single-member LLCs from their owners for tax purposes, FLD's tax status is not dispositive. The Court finds FLD's formal structure, coupled with the presence of professional advisors, sufficient to establish FLD's status as a trade or business.

For these reasons, the Court finds that FLD and RKN are under common control, and that FLD is jointly and severally liable for RKN's interim withdrawal liability payments. The Court grants summary judgment to the Funds on this issue.

As a final matter, Plaintiffs seek a declaration that RSS and RKN are not under common control, which the Funds do not dispute. Because Phil was the sole shareholder of RKN and Ryan

holds 90% of RSS, Plaintiffs are granted summary judgment on this uncontested issue.

## IV.   CONCLUSION

For the reasons stated herein, the parties' Motions for Summary Judgment are granted in part and denied in part as follows:

1.   The Funds' Motion [ECF No. 42] is granted with respect to its claims for interim withdrawal liability against RKN and for control group liability against FLD, and denied with respect for its claims for successor, single employer, and alter ego liability against RSS.

2.   Plaintiffs' Motion [ECF No. 38] is granted to the extent it seeks a declaration that RSS is not a successor of, single employer with, or alter ego of RKN, and that RKN and RSS are not part of the same control group.   The remainder of Plaintiffs' Motion is denied.

In addition to the interim withdrawal liability payments, the Funds are entitled to interest, liquidated damages, attorneys' fees, and costs, pursuant to 29 U.S.C. § 1132(g). The Funds have fourteen (14) days from the date of this Order to submit a proposed computation of these amounts.   Although the parties are encouraged to resolve any disputes regarding the Funds' calculations informally, Plaintiffs are granted seven (7)

days from the date of the Funds' submission to file their objections.

**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court

Dated:4/24/2015